**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**David Robert RUIZ, Defendant–Appellant.**

No. 94–10436.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 16, 1995.

Decided Jan. 11, 1996.

signed purpose of stun grenades as a tactical weapon qualifies them as a "destructive device" within the meaning of the statute. We agree.

Because Ruiz argues that the evidence was insufficient to convict since the government failed to prove that he intended to use the stun grenades as weapons, we must also decide whether intent to use the device as a weapon is an element of a § 5845(f) case when, as here, there is no dispute that the device is a fully assembled grenade. We think not, as the statute imposes no such requirement except when component parts are involved.

We have no difficulty with the remaining issues that Ruiz raises, and affirm.

Olin R. Hale, Phoenix, Arizona, for defendant-appellant.

Darcy A. Cerow, Assistant United States Attorney, Phoenix, Arizona, for plaintiff-appellee.

Before SCHROEDER, FLETCHER, and RYMER, Circuit Judges.

## OPINION

RYMER, Circuit Judge:

This appeal requires us to decide whether stun grenades are a "destructive device" and thus a "firearm" under 26 U.S.C. § 5861(e).

David R. Ruiz appeals his conviction, and denial of pre- and post-trial motions, arising from the sale of stun grenades in violation of § 5861(e), which prohibits the unlawful transfer of firearms. For purposes of § 5861(e), a "firearm" is a "destructive device." 26 U.S.C. § 5845(a). A "destructive device" is a grenade or similar device, unless it is not designed for use as a weapon. *Id.* § 5845(f).

The district court found "that there is the potential for unintended injury or indeed even death to one or more of the individuals who is in close proximity to where the device is discharged," and concluded that the de-

I

Ruiz worked for Accuracy Systems, which was in the business of manufacturing destructive devices. He supplied stun grenades to a co-defendant who sold them to ATF agents acting in an undercover capacity.

Ruiz was indicted on one count of knowingly and willfully conspiring to transfer destructive devices, and 10 counts of unlawful transfer of destructive devices without obtaining a transfer tax stamp as required by 26 U.S.C. § 5812. He moved to dismiss on the ground that stun grenades are not destructive devices. During evidentiary hearings on the motion, Ruiz adduced testimony that the grenades contained a Mag Dex explosive charge with a fuse to detonate the grenade and that it was not designed as a weapon. The government's evidence showed that stun grenades had been classified by the ATF as destructive devices around 1980, that they contained a high explosive flash powder with a fuse to detonate the grenade, and that they functioned as designed. The district court found that the stun grenades were destructive devices, and denied Ruiz's motion.

Following the return of guilty verdicts by a jury on all counts, Ruiz moved for a judgment of acquittal on the ground that the government was judicially estopped from asserting that stun grenades are weapons be-

cause the same ATF Agent who testified in his trial had previously testified that he didn't think of stun grenades as weapons, in the layman's sense, in *United States v. Brad Eugene Branchy, et al.,* No. W–93–CR–046 (W.D.Tex.1994) (the Branch Davidian or Waco trial). This motion was also denied. He timely appealed.

## II

■ Ruiz first contends that there was insufficient evidence that he intended to use the stun grenades as weapons. This argument fails because there is no statutory requirement that the defendant have any intent to use a fully assembled grenade as a weapon.

Section 5861(e) states: "It shall be unlawful ... to transfer a firearm in violation of the provisions of this chapter [Chapter 53 of Title 26]." Title 26 U.S.C. § 5845(a) defines "firearm" as a "destructive device." Section 5845(f)(1), in turn, provides that "destructive device" means "any explosive, incendiary, or poison gas ... (B) grenade ... or (F) similar device"; except that "[t]he term 'destructive device' shall not include any device which is neither designed nor redesigned for use as a weapon."

The only authority upon which Ruiz relies, *United States v. Fredman,* 833 F.2d 837 (9th Cir.1987), is distinguishable. There, we considered whether an unassembled commercial explosive constituted a "destructive device" under § 5845(f)(3), a different subsection of § 5845(f) from the one that controls here, and held that "[i]ntent is a necessary element, absent proof of original design or redesign for use as a weapon." *Id.* at 839. While Ruiz acknowledges that *Fredman* involved explosive components, which his case does not, he urges us nevertheless to adopt its reasoning here. We cannot do so, because § 5845(f)(3), which is applicable to components, itself defines "destructive device" as "any combination of *parts* either designed or

*intended* for use in converting any device into a destructive device." (Emphasis added.) It was in this context that we said in *Fredman* that "mere components of commercial explosives, absent proof of intent to use such components as a weapon, fail to qualify as a 'destructive device.'" *Id.* at 839. Since "parts" aren't necessarily a weapon, the statute requires intent to use them as a weapon. By contrast here, there is no dispute that the stun grenade is a fully assembled "grenade," § 5845(f)(1)(B); the only question is whether it is, or is not, designed for use as a weapon. We therefore hold that the defendant's intent to use the fully assembled stun grenades as a weapon is not a necessary element.

Ruiz makes the related argument that there was insufficient evidence of his intent to use these devices as a weapon because the person who manufactured the stun grenades testified that he designed them as lifesaving devices for law enforcement officers, not as weapons, and there was no contrary testimony from any other designer or manufacturer. What the manufacturer in essence said was that the device is to save the law enforcement officers from harm by incapacitating or injuring others who might otherwise harm the officers. Ruiz seems to attempt to use this evidence in two ways: to show that the device was not used as a weapon and to negate his own intent. As to the former, he fails. As to the latter, it does not support his claim which is irrelevant in any event. As we have held, the defendant's intent isn't part of the government's case when the device is a fully assembled grenade. To the extent Ruiz is suggesting that he could not reasonably have believed that stun grenades are a weapon subject to regulation because they have a legitimate social use, he cannot be correct since mens rea in this sense is not required.[1] Section 5845(f) does not exclude potentially constructive uses; it requires only that the device be designed for use as a weapon. As we shall explain, there is ample evidence that stun grenades are designed for

---

1. We are mindful that the Supreme Court held in *Staples v. United States,* 511 U.S. ——, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994) that the government needs to prove an accused's knowledge that a rifle had the physical properties to bring it within the statutory definition of a machine gun

to obtain a conviction under § 5861(d). Ruiz makes no *Staples* argument, as the question on which his appeal turns is not whether he knew that grenades are within the statutory definition, which they indisputably are, but whether stun grenades are designed for use as weapons.

use as tactical offensive weapons and qualify as a "destructive device."

## III

■ The heart of Ruiz's appeal lies in whether the district court correctly concluded, after an evidentiary hearing, that his indictment should not be dismissed on the ground that the stun grenades are excepted from the definition of "destructive device" because they were "neither designed nor redesigned for use as a weapon." 26 U.S.C. § 5845(f). We review the district court's factual determinations about the stun grenade for clear error, and its legal conclusion about what a "destructive device" means, de novo.

Relying on Judge Browning's dissent in *United States v. Oba,* 448 F.2d 892, 899 (9th Cir.1971), *cert. denied,* 405 U.S. 935, 92 S.Ct. 979, 30 L.Ed.2d 811 (1972), Ruiz contends that only "highly destructive items of military ordnance having no proper use in private hands" meet the statutory definition. In *Oba,* we considered whether seven sticks of dynamite wrapped in copper wire and equipped with fuse and blasting caps constituted a destructive device. Although Judge Browning believed that this kind of "ordinary commercial blasting material" was not the sort of highly destructive military or gangster-type weaponry that Congress meant to cover, *id.* at 897–98, the majority looked to the "clear reading" of the statute (and, since it was a components case, to the defendant's intent to use his homemade bomb to dynamite the city of Eugene, Oregon) to conclude otherwise. *Id.* at 894.

Our colleagues on the First Circuit faced a similar question in *United States v. Markley,* 567 F.2d 523 (1st Cir.1977), *cert. denied,* 435 U.S. 951, 98 S.Ct. 1578, 55 L.Ed.2d 801 (1978), and resolved it as we do. The devices in that case were cardboard tubes containing 3.5 to 4.5 ounces of commercially manufactured black powder with a small amount of toilet tissues as a filler, followed by cardboard discs. The ends were sealed with paraffin wax, with a fuse affixed to one end. The *Markley* court "noted that neither 'highly' nor any other modification of 'destructive device' is used in the legislation defining destructive device in either Section 5845(f) of

Title 26 or Section 921(a)(4) of Title 18." *Id.* at 526. It likewise observed that destructive devices were not referred to in the legislative history as "highly dangerous or destructive." *Id.* We agree that § 5845(f) is not limited to devices that are "highly" destructive.

By the same token, we have previously indicated that § 5845(f) is not strictly confined to military or gangster-type weapons. As we observed in affirming a conviction for firearms violations involving assembly of a device likened to a Molotov cocktail in *United States v. Peterson,* 475 F.2d 806, 810 (9th Cir.), *cert. denied,* 414 U.S. 846, 94 S.Ct. 111, 38 L.Ed.2d 93 (1973):

> We have concluded from a perusal of the legislative history of the act that Congress was well aware of the rampant destruction of property and dangers to life and limb faced by the public through the use of converted military type weaponry and the street variety of homemade instruments and weapons of crime and violence. And with this awareness Congress intended to foster law and order among the public by the proscription of original and converted military type weapons and, also, the do-it-yourself type of similar devices and weapons of crime, violence and destruction.
>
> .   .   .   .   .
>
> It is likewise manifest that Congress proscribed devices other than military type ordnance through the language in subsection (a)(7)—a gangster type firearm attachment (silencer) and (8)—a "destructive device."

Like the "friendly things" assembled into the destructive device capable of destroying property by fire in *Peterson, id.* at 811, the already assembled device sold by Ruiz is capable of destroying property by fire and incapacitating people, discombobulating them for up to a couple of days. The evidence shows that stun grenades have long been listed by the ATF as destructive devices, and were designed for use as a tactical weapon. Stun grenades are supposed to be used by law enforcement as an offensive tactical weapon, and function for their designed purpose. They are disabling and dangerous, and thus destructive, if improperly used.

We therefore agree with the district court that stun grenades are a "destructive device" within the meaning of § 5845(f).

## IV

Ruiz contends that the district court erred in denying his motion for acquittal by reason of judicial estoppel with regard to the trial testimony of ATF Agent Kenneth King. According to Ruiz, King was called by the defense because of his prior sworn testimony in the Branch Davidian trial in San Antonio, Texas that stun grenades are not weapons. At Ruiz's trial, King explained that he thought stun grenades weren't weapons in the sense understood by laymen, but that they are nonlethal weapons and qualify as a weapon under a dictionary definition.

 We review the decision whether to invoke judicial estoppel for an abuse of discretion. *United States v. Garcia*, 37 F.3d 1359, 1367 (9th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1699, 131 L.Ed.2d 562 (1995). "The doctrine of judicial estoppel is invoked to preclude a party from abusing the judicial process by taking inconsistent positions in the same litigation." *Id.* at 1366. Considering that the instant prosecution was unrelated to the Waco prosecution and involved a different defendant, that King was not acting as a spokesperson for the government but was in fact called by the defense, and that King's statements in the two trials were not directly contradictory, we conclude that the district court did not abuse its discretion in declining to invoke judicial estoppel.

## V

Ruiz maintains that the district court erred by receiving testimony about a demonstration the government had conducted to show the effect of detonating a stun grenade. The district court refused to admit the videotaped demonstration itself, but allowed a witness to testify about the demonstration and the damage that resulted. In striking this balance between prejudicial effect and probative value, the court did not abuse its discretion. Fed.R.Evid. 403; *United States v. Kessi*, 868 F.2d 1097, 1107 (9th Cir.1989).

## VI

 Ruiz argues that the district court erred by including a dictionary definition of "weapon" ("an instrument of offensive or defensive combat") in the jury instructions, but does not suggest how the definition might be inaccurate or misleading. Dictionary definitions have been relied on by other district courts that needed to determine the meaning of "weapon." *See, e.g., Lunde Arms Corporation v. Stanford*, 107 F.Supp. 450 (S.D.Cal. 1952), *aff'd*, 211 F.2d 464 (9th Cir.1954); *United States v. Homa*, 441 F.Supp. 330 (D.Colo.1977), *aff'd*, 608 F.2d 407 (10th Cir. 1979). We see nothing improper in the instructions given.

AFFIRMED.